James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Brian J. Robbins
Craig W. Smith
Kelly M. McIntyre
Julia M. Williams
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, California 92101
(619) 525-3990

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARPENTERS PENSION FUND OF WEST VIRGINIA, Derivatively on Behalf of JOHNSON & JOHNSON,<br><br>      Plaintiff,<br><br>  vs.<br><br>WILLIAM C. WELDON, MARY S. COLEMAN, JAMES G. CULLEN, MICHAEL M. E. JOHNS, ARNOLD G. LANGBO, SUSAN L. LINDQUIST, LEO F. MULLIN, WILLIAM D. PEREZ, CHARLES PRINCE, DAVID SATCHER, GERARD N. BURROW, JOAN G. COONEY, ANN D. JORDAN, JOHN S. MAYO, STEVEN S. REINEMUND PAUL J. RIZZO, HENRY B. SCHACHT, MAXINE F. SINGER, JOHN W. SNOW, RALPH S. LARSEN, ROBERT J. DARRETTA, ROBERT N. WILSON and JAMES T. LENEHAN,<br><br>      Defendants,<br><br>  -and-<br><br>JOHNSON & JOHNSON,<br><br>      Nominal Defendant | Civil Action No.<br><br><br><br><br><br><br><br><br><u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT and DEMAND FOR JURY TRIAL**</u> |

Plaintiff, by its attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## SUMMARY OF THE ACTION

1.      Given in the wrong amounts, in the wrong combination, or to the wrong person, a drug can act as a poison instead of a medicine.  What was supposed to heal can damage or even kill. Because of this danger, the pharmaceutical industry is subject to almost unmatched regulation. Regulation, however, can only do so much and at some point, patients must trust that their caregivers have their best interests in mind.  This is particularly true for the elderly in nursing homes, perhaps the most vulnerable segment of society.

2.      This action arises out of defendants' attempts to operate Johnson & Johnson ("J&J" or the "Company") above the law.  For over a decade, defendants engaged in a Company-wide business strategy aimed at maximizing sales through various violations of federal law, including the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), and the False Claims Act, 31 U.S.C. §3729(a)(2). This strategy was implemented through multiple subsidiaries of Johnson & Johnson ("J&J" or the "Company") and involved multiple illegal kickback schemes and unlawful representations by defendants.  Throughout this time, the Board repeatedly failed in its duty of oversight, expressly or tacitly approved this *modus operandi*, and, together with the Company's senior management, breached their fiduciary duties to J&J.

3.      One of J&J's most egregious kickback schemes involved defendants' exploitation of the elderly and infirmed in order to profit.  Omnicare, Inc. ("Omnicare") is a leading provider of pharmaceutical care for seniors.  From at least 1999 to 2004, J&J and Omnicare entered into a series of agreements whereby J&J would pay Omnicare to push physicians to prescribe J&J's drugs.  At a minimum, this scheme violated federal law and defrauded the government.  Under Medicaid's best price rule, after rebates for a drug reach a certain level for one customer, the supplier must also lower the price Medicaid pays.  By hiding these rebates as other forms of payment to Omnicare, J&J avoided giving Medicaid similar rebates.

4.     Omnicare and J&J's agreement also called for Omnicare to try and convince health care providers to switch drugs to those made by J&J, regardless of which drug was actually best for a particular patient. Switching prescriptions when one is working is inherently risky. Doing it simply to increase profits is inexcusable.

5.     Worse, however, is that as a result of this scheme, Omnicare and J&J pushed unneeded drugs on the elderly. One program that J&J's payments supported was nicknamed the "one extra scrip per patient" program. As a result, patients were likely given drugs that they did not need. Indeed, according to the U.S. government, one nursing home patient that was a victim of the illegal kickback and rebate scheme received 67 different drugs.

6.     Thus, the elderly were overcharged for their medication, had additional and unneeded medications administered, and were switched to J&J drugs for no medical reason. One of the drugs that J&J and Omnicare pushed on the elderly was Risperdal®, an atypical antipsychotic medication. The FDA has since warned that elderly patients with dementia treated with Risperdal® are at an increased risk of death. Risperdal® now carries a "black box" warning label.

7.     The Omnicare scheme was well-known to J&J's fiduciaries. On January 5, 1999, the U.S. Food and Drug Administration ("FDA") sent a warning letter to J&J regarding the Company's off-label promotion of Risperdal® to geriatric patients. In addition, at least one e-mail furthering the scheme was sent to over two dozen different managers at J&J. The scheme worked for a short period, increasing Omnicare's purchases from J&J by 180%, from $100 million to more than $280 million annually. This huge increase in revenues combined with the vast expenditures J&J was incurring in the form of "grants," "educational funding," and meeting sponsorship fees paid to Omnicare indicate that J&J's Board knew or recklessly disregarded the existence of this scheme.

8.      The kickback scheme at J&J was not limited to Omnicare or Risperdal®.  From at least January 2002 to at least December 2006, a J&J subsidiary, DePuy Orthopaedics, Inc. ("DePuy") paid orthopedic surgeons in part for their use of DePuy hip and knee joint reconstruction and replacement products.  On May 10, 2005, the Company filed a Form 10-Q disclosing that the U.S. Attorney's Office for the District of New Jersey had begun an investigation into the "contractual relationships between DePuy and surgeons or surgeons in training involved in hip and knee replacement and reconstructive surgery."  Despite defendants' knowledge of this investigation, the illegal kickbacks continued for well over a year.

9.      In addition to the kickback schemes and J&J's exploitation of the elderly, the Company caused its wholly owned subsidiary, Cordis Corporation ("Cordis") to engage in an off-label promotion and marketing scheme.  From at least 1996 through at least 2007, defendants represented that the biliary stents were FDA-approved for vascular use so that healthcare providers could be reimbursed at a higher rate than if the biliary stents were properly classified and coded.  In fact, the FDA had concluded that biliary stents were not safe or effective for vascular use.  Defendants' miscoding of the biliary stents for vascular use resulted in healthcare providers submitting improper claims for reimbursement to Medicare and other government agencies, in violation of the False Claims Act.

10.     The Company, through two of its subsidiaries, Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMNJ") and Ortho-McNeil Pharmaceutical LLC ("OMNP"), also illegally promoted Topamax® for unapproved psychiatric uses between 2001 and 2003.  Like the scheme with Omnicare, OMNJ paid healthcare providers kickbacks in connection with their attendance at "Consultants Conferences" during which the Company aggressively promoted Topamax® for off-label treatments despite the serious risks to patient health.  These kickbacks were not only a waste of

corporate assets, but much like the biliary stent promotion, the Topamax® scheme ultimately resulted in false claims being submitted to government health programs in violation of the False Claims Act.  Once the federal government began investigating the Topamax® promotion program, the Company discontinued this illegal promotion, but continued to illegally promote the biliary stents for unapproved uses.

11.     The defendants' focus on quickly maximizing profits came at the expense of patients' health.  Additionally, defendants failed to consider the long term affects these schemes would have on J&J.  The actions taken by J&J and its subsidiaries were implicitly approved of by management and the Board of Directors ("Board").  These schemes were widespread, prevalent, and continued for over a decade.

12.     Even after the kickbacks and rebates stopped, the cover-up continued.  In the proxy statements the Board solicited in favor of their elections, it failed to inform shareholders of the wrongdoing, their role in the wrongdoing, or the extent of the liabilities that the Company faces.

13.     It was only a matter of time, however, until this Company-wide strategy of violating federal laws would be revealed.  It started with the filing of a *qui tam* action to recover damages, penalties, and other remedies in connection with the biliary stent off-label promotional and marketing scheme pursued by J&J.  Then, on September 27, 2007, the Department of Health and Human Services ("HHS") Office of the Inspector General filed a criminal complaint in the United States District Court for the District of New Jersey against J&J and DePuy relating to the conspiracy to violate the federal Anti-Kickback Statute.  On December 7, 2007, yet another *qui tam* action was filed in the District of Massachusetts against J&J and OMNJ to recover damages, penalties, and other remedies in connection with the Topamax® kickback scheme and off-label promotion.  Additionally, two "whistleblowers" from Omnicare also filed *qui tam* actions regarding the

J&J/Omnicare kickback scheme.  The U.S. Department of Justice (the "DOJ") soon intervened in these actions.  Omnicare settled the claims against it for engaging in the kickback scheme for nearly $100 million.  J&J did not.

14.     On January 15, 2010, the DOJ filed a complaint against J&J revealing the scope and extent of J&J's violations of applicable law.  The DOJ complaint accuses the Company of violating federal false claims and anti-kickback laws among others.  The DOJ is seeking treble damages and restitution of J&J's unjust enrichment.  In addition, a consumer class action was filed on behalf of nursing home patients harmed by J&J and Omnicare's conduct.  The Company faces significant liability from the DOJ and the consumer actions.

15.     The Company settled the criminal action regarding the DePuy kickback scheme for $84.7 million in September 2007.  On April 29, 2010, the Company announced that it had agreed to pay more than $81 million to the federal government to settle criminal and civil claims arising out of the Company's illegal promotion of Topamax®.

16.     Plaintiff now brings this litigation on behalf of J&J and seeks to rectify the conduct of the individuals bearing ultimate responsibility for the corporation's misconduct—the directors on the Board and senior management—to impose responsibility upon those individuals and to recover for damages sustained by J&J due to defendants' gross mismanagement of the Company and waste of Company assets.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court also has jurisdiction of this action under federal question jurisdiction pursuant to 28 U.S.C. §1331 because this action asserts claims under Section 14(a) of the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78n(a), and has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1367(a).

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) J&J maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to J&J, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

22.     Plaintiff Carpenters Pension Fund of West Virginia ("Fund") was a shareholder of J&J at the time of the wrongdoing complained of and has continuously been a shareholder and is a current J&J shareholder.  The Fund is located at 1812 Garfield Ave., Parkersburg, West Virginia.

23.     Nominal defendant J&J is a New Jersey corporation headquartered at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey.  J&J engages in the research and development, manufacture, and sale of various products in the healthcare field worldwide.

24.     Defendant William C. Weldon ("Weldon") is a citizen of Pennsylvania.  Weldon is J&J's Chairman and Chief Executive Officer ("CEO") and has been since April 2002 and a director and has been since February 2001.  Weldon is also Chairman of J&J's Executive Committee and has been since 2002 and a member and has been since 1998 and Chairman of the Finance Committee and has been since 2008.  Weldon was J&J's Vice Chairman of the Board from February 2001 to April 2002.  Weldon joined J&J in 1971 and served in several sales, marketing, and international management positions before becoming President of Ethicon Endo-Surgery in 1992, Company Group Chairman of Ethicon Endo-Surgery in 1995, and Worldwide Chairman, Pharmaceuticals Group, in 1998.

25.     Defendant Ralph S. Larsen ("Larsen") is a citizen of New Jersey.  Larsen was J&J's CEO from 1989 to April 2002.  Larsen was also a J&J director from 1987 to April 2002.  Larsen joined J&J in 1962 and held numerous positions in the Company before being appointed Company Group Chairman in 1986.  Upon departing J&J in 2002, Larsen agreed to provide services requested by the new CEO for a period of up to five years.

26.     Defendant Robert J. Darretta ("Darretta") is a citizen of New Jersey.  Daretta was J&J's Vice Chairman of the Board from January 2004 to February 2007 and a director from January 2002 to February 2007.  Darretta was also J&J's Executive Vice President, Finance and Chief Financial Officer from 2002 to December 2006 and Vice President, Finance and Chief Financial Officer from 1997 to 2002.  Darretta joined J&J in 1968.

27.     Defendant James T. Lenehan ("Lenehan") is a citizen of Pennsylvania.  Lenahan was J&J's Vice Chairman of the Board from February 2001 to February 2004.  Lenehan was also J&J's President from 2002 to 2004.  Lenehan joined J&J in 1976 and held several marketing management positions; became a Company Group Chairman in 1993; was named Worldwide Chairman,

Consumer Pharmaceuticals & Professional Group in 1994; and Worldwide Chairman, Medical Devices & Diagnostics Group in 1999.  Lenehan was also a member of J&J's Executive Committee from at least 1998 to 2003.

28.     Defendant Arnold G. Langbo ("Langbo") is a citizen of Florida.  Langbo was a J&J director from 1991 until April 2010.  Langbo was also a member of the Nominating and Corporate Governance Committee from 2004 until 2010.  Langbo was a member of the Audit Committee from at least 1998 to 2003.

29.     Defendant James G. Cullen ("Cullen") is a citizen of New Jersey.  Cullen is a J&J director and has been since 1995.  Cullen is the Presiding Director of the Board.  Cullen is also Chairman of J&J's Audit Committee and has been since 2001 and a member and has been since at least 1998 and a member of the Nominating and Corporate Governance Committee and has been since 2004.

30.     Defendant Leo F. Mullin ("Mullin") is a citizen of Georgia.  Mullin is a J&J director and has been since July 1999.  Mullin is also a member of J&J's Audit Committee and has been since 2000 and Chairman of the Public Policy Advisory Committee and has been since 2009.  Mullin was a member of J&J's Nominating and Corporate Governance Committee from 2000 to 2005.

31.     Defendant Mary S. Coleman ("Coleman") is citizen of Michigan.  Coleman is a J&J director and has been since September 2003.  Coleman is also a member of J&J's Audit Committee and has been since 2003.

32.     Defendant Henry B. Schacht ("Schacht") is a citizen of South Carolina.  Schacht was a J&J director from 1997 to April 2005.  Schacht was also a member of J&J's Audit Committee from at least 1998 to 2005 and Chairman of the Nominating and Corporate Governance Committee from 1999 to 2005.

33.     Defendant Paul J. Rizzo ("Rizzo") is a citizen of North Carolina.  Rizzo was a J&J director from 1982 to April 2000.  Rizzo was also Chairman of J&J's Audit Committee and a member of the Nominating and Corporate Governance Committee from 1999 to 2000.

34.     Defendant John S. Mayo ("Mayo") is a citizen of New Jersey.  Mayo was a J&J director from 1986 to April 2002.  Mayo was also Chairman of J&J's Public Policy Advisory Committee from at least 1998 to 2001.

35.     Defendant David Satcher ("Satcher") is a citizen of Georgia.  Satcher is a J&J director and has been since April 2002.  Satcher is also a member of J&J's Public Policy Advisory Committee and has been since 2003.

36.     Defendant Susan L. Lindquist ("Lindquist") is a citizen of Massachusetts.  Lindquist is a J&J director and has been since February 2004.  Lindquist is also a member of J&J's Public Policy Advisory Committee and has been since 2004.

37.     Defendant Michael M.E. Johns ("Johns") is a citizen of Georgia.  Johns is a J&J director and has been since March 2005.

38.     Defendant Charles Prince ("Prince") is a citizen of Florida.  Prince is a J&J director and has been since 2006.  Prince is also Chairman of J&J's Nominating and Corporate Governance Committee and has been since 2007.

39.     Defendant William D. Perez ("Perez") is a citizen of Illinois.  Perez is a J&J director and has been since June 2007.  Perez is also a member of J&J's Compensation and Benefits Committee and Public Policy Advisory Committee and has been since 2008.

40.     Defendant Ann D. Jordan ("Jordan") is a citizen of the District of Columbia.  Jordan was a J&J director from 1981 to April 2007.  Jordan was also Chairman of J&J's Nominating and Corporate Governance Committee from 2006 to 2007 and a member from 1999 to 2002 and

Chairman of the Public Policy Advisory Committee from 2003 to 2005 and a member from 1998 to 2002.

41.     Defendant Gerard N. Burrow ("Burrow") is a citizen of Connecticut.  Burrow was a J&J director from 1993 to April 2005.  Burrow was also a member of J&J's Nominating and Corporate Governance Committee from 1999 to 2005.

42.     Defendant Maxine F. Singer ("Singer") is a citizen of the District of Columbia. Singer was a J&J director from 1991 to April 2003.

43.     Defendant John W. Snow ("Snow") is a citizen of Virginia.  Snow was a J&J director from 1998 to January 2003.

44.     Defendant Robert N. Wilson ("Wilson") is a citizen of New Jersey.  Wilson was J&J's Senior Vice Chairman of the Board from 2001 to April 2003.  Wilson was also J&J's Vice Chairman of the Board from 1989 to 2001 and a director from 1986 to 2003.  Wilson joined J&J in 1964, served in several sales and marketing management positions and was appointed Company Group Chairman in 1981.

45.     Defendant Joan G. Cooney ("Cooney") is a citizen of New York.  Cooney was a J&J director from 1978 to April 2002.

46.     Defendant Steven S. Reinemund ("Reinemund") is a citizen of North Carolina. Reinemund was a J&J director from October 2003 to April 2008.  Reinemund was also Chairman of the Nominating and Corporate Governance Committee in 2008 and a member from 2003 to 2007.

47.     The defendants identified in ¶¶24, 28-46 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶24-27 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶28-33 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶24, 28-31, 34-39 are referred to herein as the "Proxy

Defendants." Collectively, the Director Defendants, the Officer Defendants, the Audit Committee

Defendants, and the Proxy Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers, directors, and/or fiduciaries of J&J and

because of their ability to control the business and corporate affairs of J&J, the Individual

Defendants owed J&J and its shareholders fiduciary obligations of good faith, loyalty, candor, and

care and were and are required to use their utmost ability to control and manage J&J in a fair, just,

honest, and equitable manner. The Individual Defendants were and are required to act in furtherance

of the best interests of J&J and its shareholders so as to benefit all shareholders equally and not in

furtherance of their personal interests or benefits. Each director and officer of the Company owes to

J&J and its shareholders the fiduciary duty to exercise good faith and diligence in the administration

of the affairs of the Company and in the use and preservation of its property and assets, and the

highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of J&J, were able to and did, directly and/or indirectly, exercise control over

the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of J&J were required to exercise

reasonable and prudent supervision over the management, policies, practices, and controls of the

Company. By virtue of such duties, the officers and directors of J&J were required to, among other

things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted

in an efficient, business-like manner so as to make it possible to provide the highest quality

performance of their business;

       (b)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

       (c)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

51.     Under the Company's Principles of Corporate Governance, each member of the Board has unfettered access to all officers and employees of the Company.  Further, under these principles Board members must attend meetings with management and, when appropriate, outside advisors or consultants.

52.     According to the Charter of the Audit Committee that has been in place since at least 2001, the Audit Committee Defendants were responsible for assisting the Board in oversight of the Company's compliance with legal and ethical issues.  The Audit Committee Defendants, according to the charter, were required to review and monitor the results of compliance programs.  The Audit Committee met three times in both 1999 and 2000, four times in 2001, and five times each year from 2002 to 2004.

53.     According to its charter, in place since at least 2003, the Nominating and Corporate Governance Committee of the Board is responsible for assisting the Board in its oversight of the corporate governance affairs of the Company.  In furtherance of these duties, the Nominating and Corporate Governance Committee's charter requires it members to annually review the corporate governance practices and policies of the Company.   The Nominating and Corporate Governance

Committee met three times in both 1999 and 2000, four times in both 2001 and 2002, seven times in 2003, and five times in 2004.

54.    In addition, the Company has a Public Policy Advisory Committee.  The Public Policy Advisory Committee consists of at least three Board members, the Company's General Counsel and the Company's Vice Presidents for Corporate Affairs, Government Affairs and Policy, and Worldwide Operations.  This committee is charged with reviewing the Company's governmental affairs and policies and other public policy issues facing the Company.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was engaging in violations of federal anti-kickback and rebate laws; (ii) enhance the Individual Defendants' executive and directorial positions at J&J and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) deceive the public, including its own shareholders, via false and misleading proxy statements, regarding the Individual Defendants' management of J&J's operations, the Company's adherence to applicable laws, and its future business prospects.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

57.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing

## FACTUAL BACKGROUND

### A.     Medicaid

58.     Medicaid is a joint federal-state program that provides health care benefits for eligible individual and families, mainly the poor and disabled.  Each state administers its own Medicaid program while the federal Centers for Medicare and Medicaid Services monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards.  Though state participation in Medicaid is voluntary, all states have participated in the Medicaid program since 1982.  States may have different names for its own program, such as "Medi-Cal" in California and "MassHealth" in Massachusetts.

### B.     Applicable Laws and Regulations

59.     J&J's business is the focus of extensive regulation and regulatory oversight.  First is the Medicaid Drug Rebate Statute, 42 U.S.C. §1396r-8, which Congress enacted to ensure that Medicaid receives the same discounts and prices on drugs that other large public and private purchasers enjoyed.  In order for a brand name drug to be covered by Medicaid under the Medicaid Drug Rebate Statute its manufacturer must report on a quarterly basis the drug's "average manufacturer price" and the "best price" offered for that drug to the Secretary of HHS.  Additionally, the manufacturer must pay each state a quarterly rebate equal to the number of drug units purchased by the state times the greater of: (a) 15.1 percent of the drug's average manufacturer price; or (b) the difference between the average manufacturer price and the best price.

60.     Under the False Claims Act, knowingly presenting or causing to be presented to the United States any false of fraudulent claim for payment is a violation of federal law.  Knowingly includes making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the government.  "Claim" includes any request or demand, whether under contract or otherwise, for money or property which is made to a contractor grantee or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.  The United States may recover for a violation of the False Claims Act three times the amount of the damage the government sustained and a civil monetary penalty.

61.     Under the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b),  it is illegal to offer, receive, or solicit any remuneration, kickback, bribe or rebate, whether directly or indirectly, overtly or covertly, in cash or in kind, to or from any person in order to induce such person to purchase, lease or order, or to arrange for or recommend the purchasing, leasing or order of any good, service or item for which payment may be made in whole or in part under a government health care program.

62.     A violation of the anti-kickback statute can subject the perpetrator to exclusion from participation in federal health care programs.  Such an exclusion would result in catastrophic damages to J&J and its shareholders because Medicaid and Medicare would no longer cover the costs of any J&J drug.  Without Medicaid or Medicare coverage most patients would not use J&J's drugs.

63.     Members of the Board at J&J are well aware of these laws and the importance that the Company complies with them.  The Company's Policy on Business Conduct, in place since at least

2003 and required to be adopted by all J&J affiliates, stresses that "[o]ur health care business is subject to extensive governmental regulation" and that "[t]he approval and sale of pharmaceutical products and medical devices is particularly heavily regulated …. "  Additionally, the code states that "[n]o aspect of our business is more subject to governmental regulation than the development, manufacture, approval, sales and marketing of our health care products."

### C.    Omnicare

64.    Omnicare provides pharmaceuticals and related pharmacy and ancillary services to long-term healthcare institutions including the delivery of drugs to patients in nursing homes.

65.    After Omnicare delivers drugs to a patient it submits reimbursement claims on behalf of that patient to his or her insurer.  Omnicare submits approximately 65 percent of these claims to Medicaid.

66.    Omnicare also employs hundreds of "consultant pharmacists."   Consultant pharmacists make recommendations to nursing home physicians about the drugs they should prescribe to nursing home residents.  Consultant pharmacists became necessary after Congress acted to prevent the excessive use of antipsychotic drugs.

67.    Under the amendment to the Social Security Act made by the Omnibus Budget Reconciliation Act of 1987:

> Psychopharmacologic drugs may be administered only on the orders of a physician and only as part of a plan (included in the written plan of care described in paragraph (2)) designed to eliminate or modify the symptoms for which the drugs are prescribed and only if, at least annually an independent, external consultant reviews the appropriateness of the drug plan of each resident receiving such drugs.

68.    HHS implemented this amendment to the Social Security Act by mandating that a licensed pharmacist review the drug regimen of each resident and report any irregularities to the attending physician.  During this review, the consultant pharmacists make recommendations to remove, change, or add medications.  Omnicare (and J&J) refer to consultant pharmacists' efforts to

obtain physician authorization to switch nursing home patients from one drug to another as an "intervention."

## THE ILLEGAL KICKBACK SCHEMES

69.    J&J participated in multiple illegal kickback schemes related to the drugs Risperdal® and Levaquin® and in connection with products sold by DePuy.

70.    From 1999 through at least 2004, J&J gave Omnicare illegal remuneration in order to increase Omnicare's use of the drugs Risperdal® and Levaquin®.  The scheme was so successful that J&J's management called Omnicare's consultant pharmacists an "Extension of [the J&J] Sales Force."

71.    Additionally, from at least January 2002 to at least December 2006, J&J's subsidiary DePuy paid orthopedic surgeons in part for their use of DePuy hip and knee joint reconstruction and replacement products.

### A.    Rebates Based on Active Intervention by Omnicare

72.    J&J and Omnicare entered in to an agreement on April 8, 1997 (the "1997 Agreement") that provided for the Company to sell Omnicare certain drugs and then to pay Omnicare quarterly market share rebates.  The percentage amount of the rebate that J&J would pay Omnicare increased when a drug's market share increased.  Market share was based on Omnicare's purchase of each drug in comparison to Omnicare's purchases of competing products.  The 1997 Agreement further required J&J to pay Omnicare an "Annual Strategic Product Performance Rebate" on specific drugs that had "an Active Intervention Program (AIP) or Appropriate Utilization Program (AUP) applied in their favor."  The 1997 Agreement defined AIP and AUP as follows:

> "**Active Intervention Program**" shall mean a program, applied by [Omnicare] and accepted by [J&J] in writing, which is designed to appropriately shift market share to [J&J]'s Product. Active interventions can include, but are not limited to, disease management initiatives, written correspondence to Participating Providers prescribing or dispensing pharmaceutical products, educating nursing home staff

regarding [J&J]'s Products, [and] conducting clinical intervention programs through which consultant pharmacists recommend Supplier's Products when appropriate.

"**Appropriate Utilization Program**" of "AUP" shall mean a program applied by [Omnicare], and accepted in writing by [J&J], designed to cause the appropriate use of [J&J]'s Products.

73.     J&J and Omnicare amended this agreement in 1998 as it applied to Levaquin®. This amendment clarified that rebates based on Levaquin® purchases required that "Levaquin® is favored, when clinically appropriate and indicated, over all other branded Drugs also available."

74.     Thus, according to the terms of the agreements entered into between J&J and Omnicare, the rebates from J&J were an incentive for Omnicare to advocate for the Company's products over its competitors. Executives at J&J knew that Omnicare depended on receiving these rebates. One employee's e-mail noted that "[r]ebates represent approximately 60%+ of [Omnicare's] net income model."

75.     In March 2000, J&J and Omnicare entered into a new drug supply agreement (the "2000 Agreement"). This agreement was similar to the 1997 Agreement and was set to expire in 2004. Under the 2000 Agreement, J&J specified that it would not pay any rebates to Omnicare for a particular drug unless Omnicare had an AIP or AUP for that drug.

76.     J&J paid Omnicare tens of millions worth of rebates. Indeed, at Omnicare's request, J&J would pay Omnicare quarterly rebates in advance.

**B.     J&J Devises a Plan to Disguise the Rebate Payments**

77.     As explained above, drug companies need to give Medicaid a rebate of at least 15.1 percent. However, that rebate can increase if the discount offered to any single customer exceeds 15.1 percent. In the last quarter of 1998 and the first quarter of 1999, J&J needed to reduce the rebates given to Omnicare because the combined amount exceeded 15 percent.

78.     In September 1999, Omnicare believed that it was owed an additional $700,000 under the above detailed rebate scheme.  J&J, however, could not pay that amount without exceeding the 15.1 percent threshold and thus setting a new "best price," which would trigger additional rebates to Medicare.

79.     Bruce Cummins ("Cummins"), an account director with J&J, was the point person on the negotiations with Omnicare.  In an e-mail to other J&J employees, Cummins explained that due to the regulatory environment J&J could not justify the additional $700,000 as a rebate.  However, Cummins suggested looking "outside the JJHCS contract to see if anything can be done" to get Omnicare the requested money.

80.     Beginning in October 1999, J&J began discussing with Omnicare the concept of paying Omnicare for data identifying physician prescribers of antipsychotics instead of paying Omnicare the amount it believed it was owed.  Notably, Omnicare was already willing to provide this information to J&J free of charge.

81.     Employees at J&J raised concerns about the legality of paying Omnicare for this data. Martine Grant, a J&J employee in its Health Care systems division, stated that paying for data in lieu of the rebate "put us at risk for fraud and abuse."  In fact, J&J had a policy not to pay customers for data.

82.     J&J, however, not only wanted to characterize the past rebate amount owed Omnicare in this way, but call the traditional 2% rebate it paid Omnicare a payment for data.  In October 2000, J&J entered into an agreement that called for J&J to pay Omnicare $450,000 for the first quarter and then $300,000 per quarter thereafter for data until 2004, for a total of $4.65 million.  At the same time, J&J and Omnicare amended their 2000 Agreement to remove Risperdal® from the 2% rebate structure.

83.     Despite the new agreement, Omnicare never provided J&J with the required data, though J&J continued to pay Omnicare.  Instead, Omnicare occasionally supplied local J&J sales representatives with names of prescribing physicians, just as it did prior to the new agreement.

84.     In September 2003, executives at J&J began to scramble to support the payments made to Omnicare for data.  Charles Cartier, an account director at J&J, e-mailed over two dozen J&J managers in search of "any lists" Omnicare might have given J&J, even if only "randomly" or if the information was written on "scratch pads."

## C.     J&J Pays Omnicare a Variety of Other Kickbacks

85.     In addition to the rebates and the data fees listed above, J&J paid Omnicare additional kickbacks in the form of "grants," "educational funding," and meeting sponsorship fees.

86.     In 1999, J&J paid Omnicare $300,000 for "educational funding" instead of the $300,000 worth of rebates it owed.  The purposed of the education funding was to help "Omnicare's consultant pharmacists overcome objections for physicians.  This program will be especially effective in overcoming obstacles pertaining to resistance in prescribing Risperdal."

87.     Particularly noteworthy for its complete lack of concern for the patients under Omnicare's care was the "ReView" program.  The purpose of the ReView program was to identify nursing home patients for whom additional drugs could be prescribed.  In a memorandum to Omnicare's Chief Executive Officer, Omnicare's Senior Vice President of Professional Services and Purchasing referred to the ReView program as the "one extra script per patient (ReView) program."

88.     J&J made over $250,000 worth of ReView grants to Omnicare during 2000 alone.  No other drug maker paid Omnicare more than $75,000 for the ReView program during this same time.  Employees at J&J stated that the ReView program generated over 11,000 new prescriptions for antipsychotics.

89.    From 1999 to 2004, J&J also paid Omnicare between $27,000 and $50,000 a year to sponsor Omnicare's annual national managers meeting at a resort in Florida.

**D.    J&J's Kickback Scheme Inflates the Market Share of Risperdal® and Levaquin®**

90.    A memo written in 2000 by a J&J employee details the purported success of the Omnicare initiatives bought by J&J kickbacks.  According to the memo, Omnicare was running two initiatives for J&J products, one for Risperdal® and one for Levaquin®.  Both of these drugs reached their all-time market share highs, 55% for Risperdal® and 67% for Levaquin®.  The memo states that the market share numbers "[o]nce again, demostrat[es] Omnicare's ability to persuade physicians …."

91.    In September 2001, J&J noted that Omnicare grew Levaquin's® market share from 19.2% in the 4th quarter of 1998, prior the to initiation of the Levaquin® initiative, to 66.4% in the second quarter of 2001.  At the same time, J&J's competitor's market share dropped from 80% to 28%.

92.    On June 21, 2002, J&J employee Tom Forsthoefel noted in an e-mail to other J&J employees that Omnicare's pharmacist physician calling plan resulted in a 19% market share gain in 5 months for Levaquin®.

93.    Omnicare ceased its Risperdal® intervention activities only after learning of its potentially deadly side effects in 2003.  At that time, doctors became concerned about an increased risk of cerebrovascular events, including stroke, associated with Risperdal® therapy in elderly patients.  The FDA eventually determined that elderly patients with dementia-related psychosis treated with atypical antipsychotic drugs (such as Risperdal®) are at an increased risk of death.  By August 2005, the FDA mandated that all atypical antipsychotic drugs carry a black box warning of this risk.

E.   **J&J and Omnicare's Scheme Is Revealed Causing Significant Damages to the Company**

94.     On November 13, 2009, the DOJ announced that Omnicare agreed to pay $98 million to resolve allegations that it solicited and received kickbacks from J&J in exchange for recommending Risperdal®.

95.     On January 15, 2010, the DOJ took over a *qui tam* suit against the Company and filed its own complaint alleging that J&J engaged in a 5 year long scheme to cause Omnicare to push J&J drugs Risperdal® and Levaquin® (the "DOJ Complaint").

96.     According to the DOJ Complaint, J&J's kickbacks induced Omnicare to purchase, order, or recommend J&J drugs in violation of the federal anti-kickback statute.  In addition, the DOJ Complaint states that J&J knowingly caused Omnicare to make or use false records material to false or fraudulent claims paid or approved by the government in violation of the False Claims Act.  The DOJ Complaint also alleges that J&J violated the False Claims Act by conspiring with Omnicare to pay Omnicare kickbacks in violation of the federal anti-kickback statute.  The DOJ is seeking to recover treble damages plus a civil monetary penalty for each false claim.  The DOJ is also seeking to recover all amounts J&J was unjustly enriched by as a result of the illegal kickback scheme.

97.     In addition, a purported class action was filed against the Company on behalf of all nursing home residents and/or the estates of all nursing home residents who received drugs and/or services from Omnicare and/or any of its direct subsidiaries who were dispensed Risperdal®, Ultram®, Levaquin®, Duragesic®, or Procrit® and who paid money, who incurred a obligation for charges or whose benefits providers paid money on their behalf for those drugs from April 1, 1997 to the present.  According to the class action complaint, Omnicare and J&J's conspiracy continues to

this date. The class action alleges J&J violated federal antitrust laws and California's business and professions code.

### THE OFF-LABEL PROMOTION AND MARKETING SCHEMES

98.     In addition to the massive Omnicare kickback scheme, J&J's company-wide strategy to maximize sales by violating federal and state laws extended to promoting and marketing medical devices and other drugs for off-label, or non-FDA-approved uses.

99.     For example, J&J's wholly owned subsidiary Cordis engaged in an off-label promotion and marketing scheme that caused and induced physicians to improperly seek coverage and reimbursement for an unapproved use of a medical device known as a biliary stent. The FDA had not approved biliary stents for the use of treating peripheral vascular disease. Nonetheless, Cordis not only marketed the biliary stents for this unapproved use, but solicited physicians to prescribe the devices for the off-label manner by preparing false Medicare reimbursement information to physicians.

100.    Current Procedural Technology ("CPT") codes are numbers assigned to services and procedures a healthcare provider supplies to a patient. The healthcare provider submits the CPT codes to health insurance companies, or government entities such as Medicare, for reimbursement for their services. Providing inaccurate CPT codes to Medicare is a violation of the False Claims Act and similar state laws. Cordis violated the False Claims Act by distributing reimbursement guides to healthcare providers with instructions to use CPT codes which were reserved for the use of FDA-approved vascular stents, not biliary stents, which have a separate CPT code and receive lower reimbursement.

101.    Cordis did not disclose in the reimbursement guides that only FDA-approved vascular stents are subject to reimbursement and that the FDA had not approved the biliary stents, rendering

them non-covered services.  Additionally, Cordis did not disclose that the safety and effectiveness of the use of biliary stents in the vascular system was not established.  Instead, in labeling, marketing, and promoting the biliary stents to healthcare professionals, Cordis falsely represented that the biliary stents were FDA-approved vascular stents which would safely and effectively treat peripheral vascular disease.

102.    Moreover, Cordis instructed healthcare professionals to code reimbursement claims for use of the biliary stents as though they were FDA-approved vascular stents, even though the biliary stents were used in an investigational capacity prohibited by Medicare.  Healthcare providers were thus induced to submit false claims for reimbursement for biliary stents, which were not covered devices.

103.    In addition to causing healthcare providers to submit false claims for reimbursement, Cordis implemented a compensation system that incentivized and rewarded sales representatives to promote and market the biliary stents for the unapproved vascular use.  Commissions for sales for this off-label use represented the majority of Cordis' salespersons' earnings.  The quotas allocated by Cordis to sales representatives exceeded the number of biliary stents for their approved uses, thus driving representatives to sell for the off-label vascular use.  This created a sales culture which financially rewarded representatives for the illegal promotion and marketing of the biliary stents for an unapproved use.  Moreover, this increased the number of unlawful reimbursements sought from Medicare and health insurers because the reimbursement guide instructions provided inaccurate CPT codes for the biliary stents.

104.    J&J, through Cordis, thus violated the False Claims Act.  The Company faced liability for this and violations of other state False Claims Acts as alleged in a complaint filed in the Northern District of Texas on December 5, 2007.

105.   J&J also caused two other of its wholly owned subsidiaries, OMNJ and OMNP, to engage in an off-label promotion scheme that caused false claims to be submitted to government health programs.

106.   Topamax® is an anti-epileptic drug which, at the time of the kickback scheme described herein, was approved by the FDA solely for the treatment of partial onset seizures.  From at least 2001 through 2007, however, the Company engaged in a national marketing and kickback scheme to promote Topamax® for unapproved uses from weight loss to alcohol dependence, eating disorders, and mood and anxiety disorders.

107.   The Company, through its OMNJ subsidiary, gave kickbacks to healthcare providers disguised as "consulting fee" payments in order to influence their prescribing practices.  Specifically, according to the *qui tam* complaint filed in the District of Massachusetts on December 7, 2007, the Company staged "Consultants Conferences" to disseminate claims about the off-label uses of Topamax®.  These conferences were held repeatedly during at least 2007 at various locations across the country and were intended to influence participants' prescribing practices.  The Company mailed unsolicited invitations directly to physicians offering them an "honorarium" of at least $500 in exchange for their attendance at the conference as well as reimbursement for mileage, tolls, parking, meals, and accommodations at four-star hotels.

108.   Those physicians who accepted the invitation were mailed a "Healthcare Provider Consulting Agreement" ("Agreement") and directed to sign and return it to the Company in order to be paid the honorarium.  The Agreement's description of the "consultants" role was vague and undefined.  For example, with respect to the "Psychiatry Consultants" role, the Agreement stated only that consultants shall "observe and evaluate" data that "will address various affective and

psychiatric issues including mood and anxiety disorders, alcohol dependence, eating disorders, weight-management issues, [and the] clinical development of Topamax."

109.   These conferences were not actually intended to solicit participant expertise and insight, but rather to aggressively promote off-label uses of Topamax® and to influence the attendees' prescribing behavior.  The conference participants were exposed to a full-day presentation on the unapproved uses of Topamax®, despite the fact that the drug had already been on the market for many years.  At an October 11, 2003 consultants conference in Washington DC, the Company's agents repeatedly commented that Topamax® has "a wide variety of uses."  Similarly, they stated that the Company wanted to make Topamax® "available to a wider audience" and to provide participant-prescribers with "food for thought" and "evidence" so that prescribers would decide how they "want to use Topamax."

110.   The Agreement was not truly a consulting arrangement, but was a sham "contract" created to disguise the true nature of the kickback scheme, the purpose of which was to increase sales of Topamax® through off-label prescriptions.  The participating provider was not required to do anything but attend the conference in order to receive his payment.

111.   As a result of this kickback scheme, Medicare and other federal health care programs paid false or fraudulent claims for reimbursement of these illegal off-label Topamax® prescriptions which were generated through the scheme.

112.   In December 2003, the federal government began an investigation into the off-label promotion of Topamax®.  On April 29, 2010, the Company announced that it agreed to pay over $81 million to resolve the federal government's criminal allegations against OMNP and civil allegations under the False Claims Act against OMNJ.

### THE INDIVIDUAL DEFENDANTS CAUSE J&J TO DISSEMINATE
### MATERIALLY INACCURATE PROXY STATEMENTS

113.    J&J's Annual Proxy Statements filed with the SEC on form DEF 14A on or about March 12, 2008 and March 11, 2009 were materially inaccurate in that they failed to disclose numerous highly material facts and circumstances. The materially inaccurate Proxy Statements caused direct harm to the Company in that, among other things, the Individual Defendants' omissions hid the systematic legal violations that occurred within the Company.  These illegal actions resulted in the *qui tam* actions, of which the DOJ subsequently intervened and took control.

114.    Each of the Proxy Statements was intended to, and did, procure J&J's shareholders' votes with respect to matters materially affecting the Company that legally required shareholder approval. Both Proxy Statements sought and obtained election of the Director Defendants by shareholder vote, in each case upon the Board's explicit recommendation as to which directors should be elected.

115.    Each director on the Board was duty-bound—pursuant to their general fiduciary duties under New Jersey law, the specific duties applicable of directors set forth in the Company's foundational corporate documents, and by the clear provisions of the federal securities laws—to fully disclose all information material to shareholders' decision concerning how to cast their votes in connection with the election of Board members in 2008 and 2009.

116.    Despite its obligations under fiduciary duty, and the federal securities laws, the Board caused the Company to file and disseminate the materially inaccurate Proxy Statements. Specifically, in J&J's definitive Proxy Statements, defendants provided materially similar information and disclosures concerning the Company, the general responsibilities of the Board and its committees, and the basis upon which the members of the Board (or prospective members of the Board) were seeking election to another (or initial) term of office.  In addition, J&J mailed the Proxy

28

Statements to shareholders concurrently with the mailing of the Company's annual financial report. However, in the Proxy Statements, defendants uniformly failed to disclose material information to shareholders concerning critical aspects of the Board's responsibilities and activities—such as the Board's obligation to assure compliance with applicable drug marketing laws and regulations, or the fact that the financial and operating metrics disclosed in the Proxy Statements were the result of widespread criminal misconduct within J&J that the Board was duty-bound to prevent.

117.    The 2008 and 2009 Proxy Statements were materially inaccurate and incomplete, because they failed to disclose that the Company reaped hundreds of millions of dollars from Omnicare as a result of illegal kickbacks, that J&J violated federal law, and that the Company faced hundreds of millions in exposure from civil actions.

118.    In light of the Individual Defendants' material omissions from the Proxy Statements, the votes and the consequent election of directors to the Board were obtained on the basis of inaccurate disclosures. Had shareholders been provided with complete and accurate information concerning the Board's performance of its duties—including with respect to presiding over the Company's extensive violations of applicable laws—the members of the Board would not have been elected (or reelected).

119.    The election (or reelection) of the Director Defendants inflicted significant harm on the Company. In essence, the members of the Board's failure to actually perform the affirmative legal and compliance obligations directly caused and perpetuated the Company's continued violation of the drug marketing rules. In addition, instead of settling with the government as Omnicare did, the Board has directed J&J to fight the charges and thereby expose the Company to treble damages and the possibility of no longer being able to participate in Medicaid or Medicare.   The Board's assumption of affirmative compliance duties under applicable laws was directly relied upon by

others—such as federal regulators and the Company's shareholders—who, based on that reliance, refrained from taking action to terminate the Company's systematic legal violations. This reliance on the Board's assumption of duty caused direct detriment of the Company, which, in the absence of the Board's fulfillment of its obligations, was left helpless to prevent the misconduct occurring in its name.

120. Accordingly, J&J has been damaged by the materially inaccurate statements in the 2008 and 2009 Proxy Statements that procured the reelection of certain of the Individual Defendants.

## DAMAGES TO J&J CAUSED BY THE INDIVIDUAL DEFENDANTS

121. As a result of the Individual Defendants' improprieties, J&J has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

      (a)      rebates paid to Omnicare in violation of applicable laws;

      (b)      costs incurred in investigating the complaints of wrongdoing made by the whistleblowers and governmental agencies;

      (c)      costs incurred in defending itself in the whistleblower and subsequent DOJ litigation concerning its illegal rebate practices, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

      (d)      $84.7 million incurred in the settlement of the criminal action regarding the DePuy kickback scheme;

      (e)      over $81 million incurred in the settlement of the civil and criminal actions regarding the Topamax® off-label promotion scheme;

      (f)      costs incurred in defending itself in the consumer class action, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment; and

      (g)      costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to J&J.

122.   Moreover, these actions have irreparably damaged J&J's corporate image and goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

123.   Plaintiff brings this action derivatively in the right and for the benefit of J&J to redress injuries suffered, and to be suffered, by J&J as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  J&J is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

124.   Plaintiff will adequately and fairly represent the interests of J&J in enforcing and prosecuting its rights.

125.   Plaintiff was a shareholder of J&J at the time of the wrongdoing complained of and has continuously been a shareholder and is a current J&J shareholder.

126.   The Board currently consists of the following ten individuals: defendants Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, Satcher, Weldon, and director Anne M. Mulcahy.

127.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons.

128.   Together with all of the Director Defendants, the present Board knew of or recklessly disregarded the Company-wide business strategy based upon repeated and systematic violations of federal laws.  This strategy was implemented over an extended period of time through multiple divisions of J&J, was carried out at all levels of the Company, and was well-known throughout the Company.  By permitting these violations of law to continue for over a decade, the Board members failed to exercise adequate oversight over J&J, and thus face a substantial likelihood of liability for breaching their fiduciary duties to J&J.

129.    A majority of the current Board, including defendants Coleman, Cullen, Lindquist, Mullin, Satcher, Johns, Prince, and Weldon, were also directors during all or part of the time the illegal kickback schemes and violations of the False Claims Act occurred.

130.    Specifically, defendants Weldon, Coleman, Cullen, Johns, Lindquist, Mullin, Satcher, Johns, and Prince were on the Board during all or part of the time the DePuy kickback scheme was going on, which ultimately cost the Company $84.7 million.  Defendants Weldon, Coleman, Cullen, Johns, Lindquist, Mullin, Prince, and Satcher were also on the Board during all or part of the time the off-label promotion and false coding of the biliary stents was occurring.  Defendants Weldon, Coleman, Cullen, Lindquist, Mullin, and Satcher were also on the Board when the majority of the illegal kickback scheme with Omnicare was occurring.

131.    Defendants Weldon, Coleman, Cullen, Mullin, Satcher, Johns, Prince and Perez were on the Board during all or part of the time the Topamax® off-label promotion and kickback scheme was occurring, which ultimately cost the Company over $81 million.  Moreover, defendants Weldon, Coleman, Cullen, Mullin and Satcher were on the Board at the time the government investigation into this scheme began in December 2003 and when the first subpoena related to this scheme was issued.  Therefore, they knew or were reckless in not knowing that off-label promotions of drugs could result in criminal violations of the Food, Drug and Cosmetic Act, or civil violations of the False Claims Act, and should have known that the similar scheme involving the off-label promotion of the biliary stents was likely to violate these Acts as well.  These defendants were required to act upon this information to protect the Company from continued legal violations being committed in its name.  Rather than doing so, these defendants, in violation of their legal obligations, consciously ignored the information presented to them concerning the Company's extensive legal violations. As a result, defendants Weldon, Coleman, Cullen, Mullin, Satcher, Johns, Prince and Perez face a

substantial likelihood of liability for their conduct and demand upon these defendants is therefore excused.

132.    Defendants Coleman, Cullen, Lindquist, Mullin, Satcher, and Weldon are incapable of impartially considering a demand because they face a substantial likelihood of liability for their role in the illegal kickback schemes and violations of the False Claims Act.  Pursuant to New Jersey law and the Company's own Principles of Corporate Governance, these Board members were required to stay actively involved in the management of the Company and act to prevent J&J for violating applicable law.  Each of these directors, however, knowingly chose not to act to stop and prevent further violations of federal laws in the face of numerous and overwhelming facts alerting them to what was occurring at the Company, including the length of time that the wrongdoing occurred, the amount at issue, and that the illegal kickback schemes were prevalent at J&J.

133.    In addition, defendants Coleman, Cullen, Lindquist, Mullin, Satcher, and Weldon also occupied positions at the Company and on Board committees that charged them with even greater responsibility for oversight of the Company.  Defendant Weldon was an executive of the Company, becoming the CEO in 2001.  Defendant Coleman has served on the Audit Committee since 2003.  Defendant Cullen has served on the Audit Committee since 1998 and the Nominating and Corporate Governance Committee since 2004.  Defendant Mullin served on the Nominating and Corporate Governance committee from 2000 to 2005 and the Audit Committee since 2000.  Satcher has served on the Public Policy Advisory Committee since 2003.  Lindquist has served on the Public Policy Advisory Committee since 2004.  The additional responsibilities of the members of these committees are described above.  Due to these responsibilities and the widespread violation of applicable law at the Company, to the extent that any of these defendants did not have actual

knowledge of the violations, such lack of knowledge could only be the product of willful blindness that constitutes a bad faith breach of their duties.

134.    Defendants Weldon, Coleman, Cullen, Johns, Langbo, Lindquist, Mullin, Prince, Satcher and Perez were required to act upon this information to protect the Company from continued legal violations being committed in its name.  Rather than doing so, these defendants, in violation of their legal obligations, consciously ignored the information presented to them concerning the Company's extensive legal violations. As a result, they face a substantial likelihood of liability for their conduct and demand is, therefore, excused.

135.    All the Director Defendants bear a substantial likelihood of liability arising from their violation of the federal securities laws in connection with their issuance of the Proxy Statements. The Proxy Statements constituted solicitations by the Director Defendants, as applicable, for which they may be held personally liable under the federal securities laws. As set forth above, the Proxy Statements were materially inaccurate and incomplete which caused significant harm to the Company. As a result, the Director Defendants each bear a substantial likelihood of liability for their violations of the federal securities laws, are conflicted and not disinterested with respect to such claims, and are fundamentally disabled from impartially considering a demand to impose liability on themselves for violating their own statutory disclosure obligations.

136.    A majority of the Board approved of the improper business strategy or tacitly approved it by looking the other way while the widespread and far-reaching schemes occurred.  The approval of action by the Company that violates applicable law can never be protected by the business judgment rule.  Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

137.   Further, this action does not arise from a single incident, but multiple schemes spanning over seven years, which were worth hundreds of millions of dollars, and were common knowledge throughout the Company.  Serious violations of applicable law occurred systematically and at every level of the Company as a direct result of the Board's decision to embrace a policy of calculated legal violations as the Company's deliberate business strategy.  There is no legitimate "business judgment" involved in devising or carrying out such an unlawful policy.  Accordingly, demand on the Board is excused.

138.   The Board's reaction to the DOJ Complaint is further evidence that a demand upon the Board is futile.  Rather than accepting the allegations, settling the matter, and attempting to move forward like Omnicare, the Board has decided to fight the DOJ in court.  The Board will not vote to initiate litigation against the culpable fiduciaries while also fighting the action brought by the DOJ.

139.   Defendant Weldon has been an employee of the Company since 1971 and on the Board since 2001.  Weldon's principal professional occupation is his employment with J&J as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Before becoming J&J's CEO, Weldon served in several sales positions.  Thus, Weldon is well-versed on the applicable laws and regulations concerning the legality of kickbacks and rebates.  Nevertheless, it was on his watch that the Company engaged in the illegal schemes detailed herein.  Further, Weldon is dependent on the conflicted directors referenced herein for his substantial remuneration.  Thus, a reasonable doubt is raised that defendant Weldon is disinterested and independent, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

140.   Demand is futile on defendant Coleman because she would not want to endanger J&J's close ties with the University of Michigan.  Coleman is the President of the University of

Michigan.  Most recently in 2009, the University of Michigan teamed with J&J to launch a new program designed to support University of Michigan's postdoctoral researchers.  Under this program postdoctoral fellows recruited by the University of Michigan have the opportunity to work at the university and a J&J organization and will have a mentor from each organization.  Programs like this enhance the University of Michigan's reputation and help lure qualified candidates to the university.  Coleman will not jeopardize this relationship by voting to initiate ligation against the people in charge of J&J.  Therefore, demand on Coleman is futile.

141.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by J&J's officers and directors and these acts are incapable of ratification.

142.    Despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for J&J for any of the wrongdoing alleged by plaintiff herein.

143.    Any suit by the current directors of J&J to remedy these wrongs would likely expose the Individual Defendants and J&J to further violations of federal laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

144.    J&J has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for J&J any part of the damages J&J suffered and will suffer thereby.

145.    If J&J's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their

protection with corporate funds, *i.e.*, monies belonging to the stockholders of J&J.  However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by J&J against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause J&J to sue themselves or certain of the officers of J&J, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance, then the current directors will not cause J&J to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

146.    Plaintiff has not made any demand on the other shareholders of J&J to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)      J&J is a publicly held company with over 2.7 billion shares outstanding and thousands of shareholders;

(b)      making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)      making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

### COUNT I

**Against the Proxy Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Based Upon Material Misstatements in and Omissions from J&J's 2008 and 2009 Proxy Statements**

147.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

148.    The Proxy Defendants caused J&J to issue the 2008 Proxy Statement and the 2009 Proxy Statement to solicit shareholder votes for the election of directors.

149.    As alleged in detail above, these Proxy Statements contained materially inaccurate and incomplete disclosures.

150.    The inaccuracies and omissions in each Proxy Statement concerned matters of material importance to the Company and were material to shareholders in response to the solicitations embodied in each Proxy Statement. The Proxy Statements were an essential link in defendants' conscious disregard for J&J's known illegal rebate practices, as disclosure to the shareholders of the truth would have brought an end to shareholders' endorsement of the Proxy Defendants as fiduciaries.

151.    The Proxy Defendants' failure to include these material facts in the 2008 and 2009 Proxy Statements rendered the Proxy Statements materially inaccurate and incomplete, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

152.    As a direct and proximate result of the issuance of materially inaccurate and incomplete Proxy Statements, J&J suffered direct and significant damages in the form of inter alia, the perpetuation of the widespread misconduct committed in the Company's name and substantial additional liabilities related to numerous *qui tam* "whistleblower suits," consumer class actions, and other lawsuits and investigations, as well as significant expenses related thereto.

153.    In connection with the improper acts alleged under this Count, the Proxy Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

154.     This count is only alleged against the Proxy Defendants as to those proxies that were issued during their terms as directors on the Board.

155.     Plaintiff, on behalf of J&J, thereby seeks relief for damages inflicted upon the Company as a result of the misleading and incomplete proxy materials.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

156.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.     As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of J&J and because of their ability to control the business and corporate affairs of J&J, owed J&J fiduciary obligations of due care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage J&J in a fair, just, honest, and equitable manner.

158.     The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by failing in their enumerated duties which caused the violations of federal and state law that led to the *qui tam* actions, the DOJ's intervention and control of the *qui tam* actions, the criminal action, and the class action.

159.     But for the abdication of the Individual Defendants fiduciary duties, the Company would not have been damaged.  Accordingly, all of the Individual Defendants breached their fiduciary duties.

160.     The Director Defendants further violated their fiduciary duty of loyalty by permitting a Company-wide business strategy which involved various violations of federal laws.  Additionally, this constituted a violation of the duties of the members of the Nominating and Corporate

Governance Committee, the Public Policy Advisory Committee, and the Audit Committee under each committee's respective charter.

161.    The Proxy Defendants further violated their fiduciary duties of care, loyalty and good faith by violating federal law in connection with the issuance of materially inaccurate and incomplete disclosures in the Proxy Statements.

162.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

163.    Plaintiff, on behalf of J&J, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

164.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by paying illegal kickbacks to Omnicare in the form of rebates, data fees, "grants," "educational funding," and meeting sponsorship fees.  Additionally, the Individual Defendants wasted corporate assets by paying illegal kickbacks to physicians in connection with the promotion of Topamax® for off-label uses, including "consulting fees" and costs incurred in connection with the J&J-sponsored conferences, which included "honorarium" payments and reimbursements paid for mileage, tolls, parking, meals and accommodations.  The Individual Defendants knew or consciously disregarded that Company funds were spent on these illegal kickbacks.

166.    As a result of the foregoing, J&J has incurred millions of dollars of legal liability and costs to defend the Individual Defendants' unlawful actions, including settlements paid in the DOJ and *qui tam* actions.

167.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets and are liable to the Company.

## COUNT IV

### Against the Officer Defendants for Unjust Enrichment in Connection with their Management of the Company's Business

168.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

169.    By their wrongful acts and omissions, the Officer Defendants were unjustly enriched at the expense of and to the detriment of J&J.  In particular, the Officer Defendants were unjustly enriched through bonuses and other incentive compensation that they achieved from increased sales of J&J's drugs as a result of the illegal kickbacks.  On information and belief, but for the illegal rebate scheme, the Officer Defendants would not have achieved their annual incentive compensation goals.  Accordingly, because the Officer Defendants' meeting of their compensation goals was the result of the illegal promotion of J&J's drugs through the kickback and rebate scheme rather than sustainable growth of J&J's business, the Officer Defendants were unjustly enriched by the bonuses and other incentive compensation that they received.

170.    Plaintiff, as a shareholder and representative of J&J, seeks restitution from the Officer Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Officer Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' violation of federal law, breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.      Directing J&J to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect J&J and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of J&J to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the accuracy of the qualifications of J&J's directors, executives and other employees; and

4.      a proposal to appropriately test and then strengthen the internal control functions.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Individual Defendants' assets so as to assure that Plaintiff on behalf of J&J has an effective remedy;

D.      Awarding to J&J restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.      Declaring the election of directors to the Board pursuant to the 2008 Proxy Statement and 2009 Proxy Statement invalid;

42

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

<div style="margin-left:50%">

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff


By:___James E. Cecchi_____
         JAMES E. CECCHI

</div>

Dated:  May 5, 2010

Brian J. Robbins
Craig W. Smith
Kelly M. Mcintyre
Julia M. Williams
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, California  92101

**JURY DEMAND**

Plaintiff demands a trial by jury as to all claims so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff


By:___James E. Cecchi_____
        JAMES E. CECCHI

Dated: May 5, 2010

Brian J. Robbins
Craig W. Smith
Kelly M. Mcintyre
Julia M. Williams
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, California  92101

## VERIFICATION

I, Scott Brewer, hereby declare as follows:

I, Scott Brewer, on behalf of the Carpenters Pension Fund of West Virginia, have read the Verified Shareholder Derivative Complaint (the "Complaint") asserting claims on behalf of Johnson & Johnson and know the contents thereof. I am informed and believe the matters in the Complaint are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 5/3/2010

SCOTT BREWER